Filed 3/29/22  In re M.C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | C094548 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. JV2020222) |
| Plaintiff and Respondent, | |
| v. | |
| C.C., | |
| Defendant and Appellant. | |

C.C., mother of the minor (mother), appeals from the juvenile court's order finding the Yolo County Health and Human Services Agency (Agency) provided her with reasonable services.  (Welf. & Inst. Code, §§ 362.1, 366.21, 395.)[1]  Mother claims she

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

was not provided with in-person visitation, or timely and appropriate assistance with housing and medical training related to the care of, the medically fragile minor. We will affirm the juvenile court's judgment.

BACKGROUND

"On March 4, 2020, due to the outbreak of the COVID-19 virus, Governor Gavin Newsom declared a state of emergency. On March 11, 2020, the World Health Organization (WHO) declared COVID-19 a pandemic. On March 19, 2020, Governor Newsom issued an executive order directing all Californians not providing essential services to stay at home." (*In re M.P.* (2020) 52 Cal.App.5th 1013, 1016.) In recognition of the ongoing crisis, the Judicial Council promulgated an emergency rule meant to address visitation in juvenile dependency proceedings, which would expire 90 days after the lifting of the state of emergency related to COVID-19. (See *In re M.P.*, at p. 1017; Cal. Rules of Court, appendix I, Emergency Rules Related to COVID-19, rule 6(d).) However, the COVID-19 state of emergency endured.

In October 2020, as the pandemic raged on, the minor M.C. was born prematurely at 28 weeks gestation and admitted to the neonatal intensive care unit (NICU). The medically fragile minor was initially diagnosed with chronic lung disease and ventricular septal defect (VSD), requiring that she live in a clean, smoke-free environment and that she be on oxygen support at all times. Two months after her birth, the minor underwent hernia surgery and was prescribed monthly medications and placed on a special high-calorie diet. In order to manage the minor's special medical needs, mother, and S.D. (father) would need to take the minor to follow-up appointments with a care team which included a cardiologist, a pulmonologist, a respiratory therapist, a pediatrician, a registered dietician, an eye doctor, lung clinic staff and Alta Regional Center staff, learn specific skills and procedures, and return to the hospital frequently to check on the minor's lung development and overall growth.

Despite attempts to educate the parents regarding administering the minor's medications and maintaining a smoke-free environment, mother struggled with giving the correct dosage and failed to schedule an appointment for support services, father was "not interested," and both parents "reeked of smoke." Additionally, mother reported she had recently moved into father's home where she was experiencing escalating emotional and verbal abuse from father. Mother stated father was an alcoholic and became verbally abusive when he drank. Mother also reported she had been diagnosed some time ago with anxiety, depression, and post-traumatic stress disorder, but was not taking her medication on a regular basis. She had a history of methamphetamine use but claimed she completed drug rehabilitation in January 2019 and has been clean and sober since that time, despite admitting she smoked marijuana with father on occasion. Her 23-year-old autistic daughter had been placed in a guardianship with the maternal aunt due to mother's methamphetamine use. On October 29, 2020, mother tested positive for marijuana and amphetamines.

The social worker spoke with father, who appeared to be under the influence of alcohol and became aggressive and demanding throughout the interview. Father denied any domestic violence allegations and claimed he never physically or verbally abused mother. He also denied having a drinking problem but acknowledged he and mother drank alcohol and smoked marijuana together.

The following day, while the social worker was interviewing the parents' apartment case manager at the father's complex, she reported that she observed the father throwing the mother out of the apartment along with all of the mother and minor's belongings. When mother attempted to get back into the apartment, father shoved her, causing her to fall and land on her face. Mother reported father had acted similarly several times in the past.

Prior to being discharged from the NICU, a protective custody warrant was issued placing the minor in the care and custody of Agency due to the parents' history of

domestic violence, substance abuse, and neglect, mother's mental health issues, and the parents' inability to properly address the minor's extensive medical needs. On November 4, 2020, the juvenile court ordered the minor detained. Following a discussion about the minor's medical fragility, including the need to be on oxygen around the clock, and concerns regarding the risk of exposure to COVID-19 and other viruses, the court directed the Agency to consult with the minor's physicians to determine whether in-person visitation was appropriate. In particular, the court stated, "You may not risk this child's life over visitation, you just can't." In the meantime, the court ordered 30-minute visits with the minor while hospitalized and video visitation after discharge pending further information from the minor's physicians and continued the matter to review the visitation schedule.

The Agency reported the minor was discharged from the hospital on November 5, 2020, and eventually placed with a foster family who specialized in medically fragile infants and had experience with newborns with chronic lung disorders. The minor's neonatologist stated that the minor "should only attend required medical appointment[s] due to being a high-risk fragile infant with a compromised immune system," and "[b]eyond medical visit[s], minimal contact in regards to the number of people and duration of visits [i]s recommended in light of [the minor's] placement in Foster Care." Based on the doctor's instructions, the Agency recommended no in-person visits for the minor "at this time."

At the visitation review hearing on November 16, 2020, mother's counsel requested video visitation and at least one in-person visit each week, noting the importance of visitation to reunification. The juvenile court ordered continued video visits and, at counsel's request, directed the Agency to provide an update from the minor's doctor at every hearing regarding the feasibility of in-person visits and any possible means of mitigating exposure to the minor. The court emphasized, "I would very much like the parents to be able to have in-person visits. But again, I can't risk [the

4

minor's] life. And when you have a baby this compromised, that's exactly what we're doing."

The jurisdiction/disposition report stated that while the parents were living together, not smoking, and using nicotine patches, the Agency was concerned that the parents were unable to demonstrate an ability to provide a smoke-free environment for the minor. The parents were both enrolled in an outpatient treatment program but had not been asked to complete a drug test. Mother claimed there had been only one incident of domestic violence in her relationship with father. The parents either denied or downplayed the issue of verbal and emotional abuse in the relationship, and both denied any substance abuse problems. Mother claimed her positive test for methamphetamine was a false positive. Father stated he had no drug or alcohol issues and claimed he smelled of alcohol during a visit because he had been using hand sanitizer. The parents were participating in three hours of weekly supervised visits with the minor via video conference.

On December 9, 2020, minor's counsel informed the juvenile court that the minor's condition had worsened. Her lung functioning had declined, and she was having breathing issues that required inhaled steroids and albuterol. Despite the doctors' attempts to wean the minor off of oxygen, the minor was unable to be off oxygen for even a few minutes at a time. Counsel noted there were concerns regarding the minor's feedings, including coughing, aspiration, and reflux during feedings, adding the minor was currently at an emergency appointment with her gastroenterologist. Minor's counsel requested, and the court ordered, that the visitation schedule remain the same due to the minor's "fragile and worsening medical condition."

On January 11, 2021, the Agency reported mother's disclosure that father had been drinking heavily, including during juvenile court hearings and video visits with the minor, and his verbal abuse was getting worse. Fearing father might hurt her, mother

moved out of father's apartment and into a confidential shelter with other victims of domestic violence.

The minor required a surgical procedure requiring anesthesia to place a gastrostomy tube (G-tube) due to multiple feeding issues and concerns regarding aspiration, tachypnea, and fatigue. The minor was receiving weekly physical therapy to address her high tone and stiffness, lack of mobility and asymmetric movements, and early intervention services through Alta Regional Center. The minor's pediatric doctor, Kimberly Breneisen, M.D., stated that, due to the minor's medical condition and plans for the G-tube placement surgery, the minor should not have contact with anyone outside of essential medical personnel and her current immediate foster placement who were already self-isolating. Dr. Breneisen cautioned, "[t]here is no exception to this due to the pandemic and [the minor's] lung issues."

On January 11, 2021, the juvenile court sustained the petition as amended by stipulation and took jurisdiction over the minor. The court continued the minor's out-of-home placement, ordered reunification services to the parents, and ordered the parents to attend visits with the minor separately, noting visits would be suspended or terminated if either parent were found to be disengaged or under the influence during visits. Finally, the court put the matter over for eight weeks to discuss visitation and ordered the Agency to provide a written report from the minor's doctor regarding whether in-person visitation was appropriate.

On March 1, 2021, the minor's Court Appointed Special Advocate (CASA), Kelly Hargreaves, filed a memorandum with the juvenile court regarding her concerns that changing video visits to in-person visits might jeopardize the minor's health. Hargreaves stated that, according to the minor's pediatrician, contracting COVID-19 would be "critical" to the minor's condition given the minor's serious health conditions including chronic lung disease and dependency on oxygen. Hargreaves noted that the minor's oxygen level frequently fluctuated thus requiring experienced caregiver intervention.

6

Hargreaves recounted having observed, both in the hospital and in weekly visits, caregivers had to intervene with life-saving actions such as wiping or suctioning the minor's mouth to avoid choking, patting the minor's back to stimulate her, increasing the minor's oxygen, administering albuterol, beginning rescue breathing, and calling 911. Hargreaves stated that, while the parents had observed these interventions, they had not performed any of the interventions. Hargreaves added that, while having a pediatric nurse present during in-person visits could mitigate risks associated with the parents' inexperience, the risk to the minor of contracting COVID-19 by increasing her time in public and with her parents in close proximity warranted that visits be continued via videoconference.

The March 4, 2021, interim review report detailed the minor's diagnoses which included bronchopulmonary dysplasia, developmental delay, abnormal muscle tone, chronic lung disease of prematurity, dysphagia cerebral palsy, static encephalopathy, extreme prematurity, ventricular septal defect, patent foramen ovale, anemia of prematurity, respiratory distress syndrome, congenital heart disease, visual impairment, immature retina, gastroesophageal reflux/esophagitis, retinopathy of prematurity level 3, and possible seizure. The minor was oxygen-and G-tube dependent, she was on numerous different medications, and she required the assistance of medical equipment including oxygen compressor tanks, a pulse oxygen monitor, a nebulizer, an oral secretion suction machine, and a feeding pump. Following surgery to insert the G-tube feeding device, the minor developed an infection which was ultimately treated successfully. She was taken to the emergency room after having "seizure-like activity" as captured on her baby monitor and was prescribed anti-seizure medication.

During an appointment, Dr. Breneisen noted the minor continued to have issues with her breathing, experiencing desaturation and refluxing and she was at risk of aspiration and periventricular leukomalacia (PVL), a condition seen in preterm babies who have experienced a stressful NICU course. She opined that the minor was "clearly

7

sick," and her lungs were "not 'that great.' " She also cautioned that if there were to be in-person visits, they would have to be in a "very controlled environment in which there is someone capable of monitoring and managing [the minor's] oxygen level, ability to complete a G-tube feeding if she will be visiting for more than two (2) hours or as needed, and has to know how to suction." Dr. Breneisen felt a licensed nurse would be best suited to complete those procedures and the parents would not, unless and until they received extensive training and felt comfortable completing those tasks. Dr. Breneisen was gravely concerned about the coronavirus pandemic and stated anyone coming into contact with the minor must be adequately masked and thoroughly screened, including an assessment of their current living situation, whether they had come into contact with any person who was sick, and whether they had had any potential exposure to the virus. The doctor noted that COVID-19 could be deadly to the minor due to all of her medical complications.

Mother and the social worker attended the minor's medical appointments via videoconference in February and March 2021. The minor continued to experience oxygen desaturation and episodes of refluxing, not swallowing properly, and gurgling causing secretions to build up and placing her at risk of choking. She needed to be suctioned properly in those instances. She was participating in physical therapy and cognitive development therapy and had numerous future appointments with specialists due to her "enormous" medical needs. The neurologist confirmed his diagnosis of cerebral palsy and reported the minor would need to undergo a magnetic resonance imaging (MRI) and an electroencephalogram (EEG) and be on anti-seizure medication for a minimum of two years. The gastrointestinal doctor stated an exception could be made to allow mother to attend the minor's appointment to change the G-tube in person so long as she passed a COVID-19 health screening.

Mother was reportedly living at a women's shelter where she was receiving domestic violence counseling. She was hopeful she could obtain housing through that

8

resource. She was also participating in services and receiving monthly psychiatric care. She engaged in supervised virtual visitation with the minor three times per week. The Agency reported it was unable to facilitate in-person visits due to the high risk of jeopardizing the minor's health and it did not have "the structure in place for [the minor] to be provided with the level of required medical care during in-person visitation (suctioning, oxygen management and G-tube management/feedings) at the Agency's office." It was noted that mother did not have any experience with, and had yet to learn the skills required for, the management of the minor's medical equipment.

The Agency was very concerned that, due to the fact that its office was open to the public where people came and went for various purposes, it could not guarantee the sterile environment necessary for the minor to have in-person visits. Mother was residing in a communal living environment where the risk of possible COVID-19 exposure was high. The Agency was exploring resources to provide mother with hands-on training on parenting and how to administer medical procedures such as G-tube care, suctioning, oxygen management, and administration of medication in order to prepare mother in the event the minor became medically stable enough for in-person visits. The Agency requested that the juvenile court order mother to complete a psychological evaluation to determine what additional services would most benefit her, as the visitation service provider noted mother might have some processing delays and the Agency wanted to ensure mother was receiving the appropriate services for her particular needs.

At the visitation review hearing on March 8, 2021, the juvenile court ordered no in-person visits stating, "I can't authorize in-person visits, I won't authorize in-person visits. It's too dangerous for this child." The court ordered further visitation review in May 2021 and continued the matter for discussion on the request that mother undergo a psychological evaluation.

The March 26, 2021, interim review report set forth details of the minor's continuing medical issues and concerns from the minor's various specialists regarding

9

her exposure to infection from COVID-19. The minor's pulmonologist advised that the parents would have to limit their exposure risk as much as possible if they were to have any contact with the minor and opined that any contact at all placed the minor at high risk. Mother received her first COVID-19 vaccination on March 25, 2021, and was scheduled to receive her second on April 15, 2021. The Agency was hopeful that, once fully vaccinated, mother could receive the necessary hands-on training from the minor's health care providers.

At the continued hearing on March 29, 2021, mother's counsel stated as follows: "After looking at the report I certainly understand the extreme caution and concern regarding in-person visits. However, I am asking that the Agency allow for in-person visits once my client has received her second vaccination . . . scheduled for the 15th of April." Mother's counsel argued mother was "almost done with her vaccination" and should be allowed the same contact as the minor's service providers. The juvenile court ordered the psychological evaluation for mother and declined to allow in-person visits stating, "[The minor] is a very sick little girl and I do not want anything to happen to her." The court added that, before it could feel comfortable allowing mother to care for the minor, "I need to know that she would be able to do that and I'm going to need a psychological evaluation to know that . . . . [¶] I'm glad Mom has gotten her shots or is getting her shots, gotten one, going to get the next one, so we're getting closer to perhaps doing in-person visitation. But the thing that's stopping me is that if [the minor] gets sick, looks to me from reading the report, that there's an extreme likelihood that [the minor] will die, so it's just not time yet." The court continued the matter to revisit the visitation issue stating, "It seems to me like [the minor] is just not getting to the point where we'd be comfortable doing this and she needs at least a month or so." When mother's counsel asked if there was anything more mother could do to facilitate in-person visits, the court responded, "[I]t looks like [mother] is doing what she needs to do. So one other thing perhaps she could do is if there's a way that she can isolate herself to

10

make sure that she is safe, but getting the vaccination is a good thing. But until and unless I hear from the doctor that this is safe, there's nothing she can do. There's really nothing she can do. This is [the minor's] life and in order to keep her safe, we have to make sure she doesn't get a respiratory illness, especially COVID, but any kind of illness. She is so fragile right now."

Mother was fully vaccinated by April 2021. She participated in a juvenile court-ordered psychological evaluation and completed her outpatient drug treatment program. She continued to reside at the women's shelter but had been referred to two housing programs, completed a housing voucher, and was on the waiting list for housing. Mother was actively searching for an apartment and had submitted several applications for housing. Mother was also actively participating in or had completed her reunification services. She continued to attend all of the minor's appointments by videoconference. Dr. Breneisen remained concerned about mother's communal living situation in which "the variables cannot be controlled" (e.g., sharing space with others who were going in and out of the shelter) and, despite that mother would eventually be fully vaccinated, recommended no in-person visits.

On May 24, 2021, at a visitation review hearing, the Agency informed the juvenile court that Dr. Breneisen was still recommending no in-person visitation until mother obtained noncommunal housing. Minor's counsel expressed concern that "we are going to run into a reasonable services issue at some point" and requested another hearing in one month. Mother's counsel agreed but requested immediate in-person visitation, noting mother was fully vaccinated and should be allowed the same privileges as service providers who were required to wash their hands and be vaccinated, masked, and gloved before being around the minor. Mother's counsel stated mother was working with her service providers to secure housing but could not control whether she was accepted after applying. Further, mother was willing to COVID test and isolate in a hotel provided by the Agency if necessary. The CASA recommended that in-person visits be postponed

11

noting that more information was coming out about people who were fully vaccinated and then subsequently became infected with the COVID-19 virus. The court denied in-person visits stating, "I'm still of the opinion that we need to follow what the doctor is saying. I absolutely cannot risk this child's life and so one more month we'll put it off . . . . [¶] But with the breathing issues and everything else, it's just too risky."

In June 2021, CASA informed the juvenile court that mother's communal housing environment placed her at higher risk of contracting COVID-19. Because the minor continued to be in extremely fragile health, the CASA deferred to the opinions of the minor's pediatrician and caregivers that, notwithstanding mother being fully vaccinated, the minor's life "would be seriously jeopardized by mother having physical contact with the [minor] because she is living in a community setting where the likelihood of a "vaccination break-through" is more likely."

The social worker who attended the minor's video conference medical appointments with mother noted a concern that when the doctor discussed medications, breathing, and reflux, the mother asked unrelated questions. Mother appeared to struggle with connecting the information she received from the minor's doctors and specialists. The more information mother received, the more she seemed to struggle to consolidate and articulate the information. When the minor had to return to her pulmonologist to address difficulties in tapering down her oxygen, mother continued to ask unrelated questions and the doctor had to remind her that the appointment was to address the minor's breathing issues. At an appointment to fit the minor with a helmet, mother gave the orthotist inaccurate information about the minor's diagnoses.

The Agency received a May 27, 2021, letter from Dr. Breneisen stating mother would be permitted to attend the minor's in-person medical appointments so long as she completed and passed the COVID-19 screening questions two days prior to the appointment. However, Dr. Breneisen continued to recommend no in-person visits until she received further guidance from the Centers for Disease Control and Prevention

12

regarding mother's living situation. Based on Dr. Breneisen's letter, the Agency recommended the juvenile court authorize mother to attend in-person medical appointments for the minor.

On June 14, 2021, the social worker spoke with Dr. Breneisen's medical staff who stated that Dr. Breneisen recommended in-person visits if mother was fully vaccinated, masked, and screened, and the visitation site was maintained for safety. The Agency expressed its concern that the Child Welfare Office would not meet the criteria for a safe visitation site given that it was a public space and numerous parents were constantly using the visitation rooms with their children. The Agency felt that in-person visits should take place only after mother found a safer, more controlled environment in which to live in order to reduce the minor's risk of contracting COVID-19. In addition, the Agency continued to search for the appropriately trained personnel to be present at all visits to monitor for safety, tend to the minor's needs, and provide mother with hands-on training.

Dr. Breneisen followed up with a letter stating, in light of changes to the state's COVID-19 guidelines, she was authorizing in-person visits for mother "when the state has changed their definitions" and mother was fully vaccinated and in "a stable environment as to know if there are exposures to infection." Dr. Breneisen recommended that anyone visiting the minor should meet the same conditions as well, and that visits would require the presence of someone "capable of tending to [the minor's] airway with suctioning if needed, oxygen management, and G[-]tube feedings if the visit is over 2 hours." Dr. Breneisen also noted that the Agency would need to provide mother with the necessary instruction on how to care for a medically fragile child. The Agency recommended the juvenile court authorize in-person visits once mother "obtains her own housing and when Dr. Breneisen provides the Agency with [the minor's] care plan."

On June 24, 2021, the Agency requested, and CASA agreed, that the juvenile court authorizes mother's in-person attendance at the minor's medical appointments

13

immediately and authorize in-person visits as soon as mother obtained independent housing and the Agency secured appropriate medical care during the visits. Mother's counsel noted that mother had done everything that was asked of her and was doing everything in her power to obtain housing. Mother was fully vaccinated and willing to cooperate with all medical requirements. Given that the case was coming up on the six-month review, counsel requested that the court order in-person attendance at medical appointments and in-person visits not conditioned on mother finding housing. The court authorized mother to attend the minor's medical appointments in person and to begin in-person visits with the minor after obtaining safe housing.

The CASA report for July 12, 2021, set forth concerns arising from caregivers and other professionals that mother's interactions reflected her lack of understanding of the minor's physical conditions and how to treat those conditions. When asked by doctors to describe the conditions, mother was either unable to do so or made inaccurate statements despite her participation in nearly every appointment. Additionally, when the minor was in distress during video visits and the caregiver administered emergency treatment, mother did not ask or seem to understand what the caregiver needed to do. The CASA recommended that mother be permitted to have in-person visitation once the Agency confirmed mother obtained stable, smoke-free, private housing and limited contact with other individuals in order to reduce the risk of the minor contracting COVID-19 or any other illness.

Mother's psychological evaluation was completed by Wendy McCray, Ph.D. Dr. McCray diagnosed mother with borderline intellectual functioning and unspecified affective disorder, noting mother "has difficulty understanding and executing increasingly complex tasks," particularly those "that require nonverbal problem solving and abstract reasoning." Mother also demonstrated impairment in memory and presented as "a hands-on learner who would likely do best with demonstration and repetition, rather than verbal instructions and having to rely on her memory." Dr. McCray stated that

14

mother was likely to have difficulty with "unexpected, unpracticed crisis situations and complex decision making." The doctor opined that, were mother to be the minor's primary caretaker, mother would require "specific educated support as to how to handle various potentially emergency crisis situations" with "respite insofar as she becomes easily overwhelmed and has difficulty multitasking."

The July 12, 2021, status review report stated mother was still residing at a confidential shelter, but she had received a housing voucher in May 2021 and was actively searching for housing. Mother was participating in or had already completed her reunification services, was actively participating in person in the minor's medical and developmental appointments and had recently received G-tube training. She was also receiving additional training because she reportedly struggled to read the minor's cues during videoconference visits. Dr. Breneisen provided a referral to Shriners Hospital for Physical Medicine and Rehabilitation and a list of nursing staffing agencies to help with training for mother and visitation supervision to ensure the minor's medical needs were met during visits.

At the July 19, 2021, six-month review hearing, mother's counsel submitted on the Agency's recommendation to continue reunification services but argued the Agency failed to provide reasonable services, arguing there were no in-person visits with the minor. Counsel acknowledged there were unique circumstances involved but argued the requirements for in-person visits continually changed, including that mother obtain safe, stable housing. Counsel argued that mother was held to a different standard than everyone else and it was not reasonable to allow mother to attend doctor's appointments in person but not allow her to attend in-person visits. Counsel further argued the juvenile court's determination regarding in-person visits could not hinge on the physician or anyone else.

The Agency argued it provided all of the necessary services but did not provide in-person visits because, after numerous and repeated hearings to review the current

15

situation and based on recommendations from the minor's doctor, the juvenile court ordered no in-person visits. The Agency further argued mother began attending the minor's medical appointments in person and had been permitted to hold and comfort the minor during examinations by Dr. Breneisen. The Agency stated it was attempting to obtain more information regarding in-person visits at a doctor's office versus in-person visits at an Agency office, noting the Agency was considering utilizing a special room that was not used by anyone else and solely dedicated to visits between mother and the minor. The social worker was diligently working on securing nursing care to be present during the visits to make sure mother had all the support she would require for a safe visit and to teach mother how to provide medical care to the minor. The Agency requested that the court find reasonable services were provided given the minor's "extreme special needs, the unusual situation with the COVID pandemic, and the fact that the Court did review that very issue on a frequent basis."

The juvenile court found reasonable services were provided to mother, continued services to mother as modified in the case plan and terminated services to father. With respect to visitation, the court ordered in-person visits for mother for one hour per week once the Agency secured appropriate medical staff to attend the visits, giving the Agency authority to increase visits. The juvenile court set the matter for another hearing to review the visitation issue.

## DISCUSSION

Mother contends there was insufficient evidence to support the juvenile court's finding of reasonable services. She claims the Agency failed to provide her with in-person visits with the minor, unreasonably delayed in providing her training regarding how to care for the minor's medical needs and failed to timely and diligently assist her in finding suitable housing other than the home she shared with other victims of domestic violence.

16

The Agency argues mother should be precluded from raising her claim of unreasonable services as it is nothing more than a guise for a challenge to the juvenile court's visitation orders which mother forfeited for failure to timely appeal. In any event, the Agency asserts, there was substantial evidence to support the finding of reasonable services as the visitation order was reasonable under the circumstances and mother was provided with reasonable medical training and housing assistance. The Agency further argues any error was harmless because the court ordered six additional months of services for mother, consistent with the remedy she seeks here on appeal.

As we explain, mother failed to timely challenge the juvenile court's various visitation orders issued on or after the disposition hearing and has therefore forfeited any challenge to those orders here. With respect to her claim of unreasonable services, there was sufficient evidence to support the court's finding that the services provided to her were reasonable.

"Reunification services must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' (§ 362, subd. (c).) Accordingly, a reunification plan must be appropriately based on the particular family's 'unique facts.' [Citation.]" (*In re T.G.* (2010) 188 Cal.App.4th 687, 696-697 (*In re T.G.*).)

"[The Agency] 'must make a good faith effort to develop and implement a family reunification plan. [Citation.] "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . ." [Citation.]' [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.] 'The applicable

17

standard of review is sufficiency of the evidence. [Citation.]' [Citation.]" (*In re T.G., supra*, 188 Cal.App.4th at p. 697.)

As this court explained in *In re T.M.* (2016) 4 Cal.App.5th 1214: "In addition to requiring a court to deny visitation if the child's safety is at risk, the plain language of section 362.1, subdivision (a) only requires visitation as frequently as the well-being of the child allows. Accordingly, if visitation is not consistent with the well-being of the child, the juvenile court has the discretion to deny such contact. As courts have explained, 'well-being' includes the minor's emotional and physical health. [Citations]." (*Id.* at pp. 1219-1220.) "This reading of the statute is consistent with dependency law's guiding principle of the well-being of the child: 'While visitation is a key element of reunification, the court must focus on the best interests of the children "and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300." [Citation.]' [Citations.]" (*Id.* at p. 1220.) "[T]he parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense . . . ." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.)

An order setting visitation is reviewed for an abuse of discretion (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356), which will not be disturbed, "unless the trial court made an arbitrary, capricious, or patently absurd determination." (*Ibid.*, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

A. *Visitation*

Mother asserts that, despite her repeated requests, she was not allowed to have in-person visits with the minor other than the incidental contact she had once she was permitted to personally attend the minor's medical appointments. She argues she was fully vaccinated and was willing to quarantine, wear full protective gear, and test before each visit, but was nonetheless denied in-person visits and contact-based primarily on the possible risk of COVID-19 transmission. She further argues she should have been

afforded contact to the same extent the minor's medical providers and foster parents were allowed, and denial of that right was an arbitrary restriction on her ability to reunify with the minor. We find no merit in these claims.

As a preliminary matter, the Agency provided visitation to mother consistent with the juvenile court's visitation orders throughout the proceedings. As previously discussed, mother did not timely challenge those visitation orders. In any event, we will proceed with a discussion of the origin and propriety of the no in-person visitation orders.

The record is replete with examples of the minor's medical fragility, including numerous issues related to her premature birth, respiratory distress syndrome, congenital heart disease, visual impairment, reflux/esophagitis, and seizures. She was oxygen-and G-tube dependent and required numerous medications and medical equipment and staff trained to use that equipment. Given the minor's numerous and serious medical issues and her compromised immune system, exposure to and contact with other people and environments, particularly during the global COVID-19 pandemic, placed her at great risk of contracting a life-threatening virus or condition.

The minor was admitted to the NICU where she remained under the care of a registered nurse for two months. At the detention hearing, the juvenile court directed the Agency to consult with the minor's physicians to determine whether in-person visitation was appropriate noting, "You may not risk this child's life over visitation, you just can't." The court continued the matter but ordered video visitation pending further information from the minor's physicians.

When making its visitation orders throughout the dependency proceedings, the juvenile court was provided with and considered the opinions and recommendations of the minor's many physicians and medical specialists. For example, upon the minor's discharge from the hospital in November 2020, the minor's neonatologist recommended that the minor "should only attend required medical appointment[s]" due to her compromised immune system and have "minimal contact in regards to the number of

19

people and duration of visits" in light of her placement in foster care. After considering that recommendation, the court ordered video visits only stating, "I would very much like the parents to be able to have in-person visits. But again, I can't risk [the minor's] life. And when you have a baby this compromised, that's exactly what we're doing." Similarly, when the court was informed in early-December 2020 that the minor's lung functioning had declined, she was having breathing issues, she could not be weaned off of the oxygen, and she was experiencing coughing, aspiration, and reflux during feedings, the court ordered that visitation remain the same due to the minor's "fragile and worsening medical condition." In January 2021, the minor's pediatrician stated that the minor required surgery to place a G-tube to address multiple issues and concerns and that, without exception, the minor should not have contact with anyone other than essential medical personnel and her foster family members (who were already self-isolating) due to the COVID-19 pandemic and the minor's lung issues. The court continued video visits for further review in eight weeks and ordered the Agency to obtain a report from Dr. Breneisen regarding the appropriateness of future in-person visitation. In the meantime, however, mother attended all of the minor's appointments by videoconference, including appointments with cardiology, neurology, and pediatrics.

Dr. Breneisen continued to recommend no in-person visits due to the minor's serious medical issues and the potential to become exposed to serious health risks including the COVID-19 virus. She urged that, even if the parents were fully vaccinated and practiced all necessary precautions, in-person visits should not occur unless there was someone such as a licensed nurse present who was capable of monitoring and managing the minor's oxygen levels, completing G-tube feedings, suctioning whenever necessary, and addressing any and all emergent medical issues. The Agency reported it did not have the structure in place to provide the required medical personnel during in-person visits and was, therefore, unable to facilitate in-person visits due to the high risk of jeopardizing the minor's health. The Agency had further concerns that mother was residing in a

20

communal living environment where the risk of COVID-19 exposure was high, and that it could not guarantee a sterile environment for in-person visits in its offices due to the fact that members of the public came and went on a daily basis. The juvenile court continued to deny in-person visits due to the risk of illness or death to the minor stating, "I can't authorize in-person visits, I won't authorize in-person visits. It's too dangerous for this child." However, the court held regular visitation review hearings to discuss the issue.

In March 2021, it was the minor's pulmonologist who opined that any in-person contact placed the minor at high risk and advised that the parents limit their own exposure risk as much as possible if they were to have any contact with the minor. The juvenile court ordered mother to complete a psychological evaluation to determine whether mother had some processing delays and what additional services might assist her in that regard and denied in-person visits. The court acknowledged mother was in the process of getting vaccinated against COVID-19 but noted that "if [the minor] gets sick . . . there's an extreme likelihood that [the minor] will die."

By April 2021, mother was fully vaccinated against the COVID-19 virus. However, her communal living situation continued to concern Dr. Breneisen, who recommended no-in person visits. At a hearing on May 24, 2021, after mother stated to the juvenile court that she was willing to COVID test and isolate in a hotel, if necessary, the court denied in-person visits stating, "*I'm still of the opinion that we need to follow what the doctor is saying.* I absolutely cannot risk this child's life and so one more month we'll put it off . . . . [¶] But with the breathing issues and everything else, it's just too risky." (Italics added.)

In late-May 2021, Dr. Breneisen recommended that mother be permitted to attend the minor's medical appointments in person with the caveat that she pass a COVID-19 screening test two days prior to the appointment. The following month, the juvenile court followed the recommendation and authorized mother to attend the minor's appointments

in person. Once mother began to attend those appointments in person, she was permitted to hold and comfort the minor.

In June 2021, Dr. Breneisen authorized in-person visits so long as mother was fully vaccinated and in a stable environment, someone medically qualified was present to tend to the minor's medical issues, and mother was provided with the instruction necessary to care for the medically-fragile minor. Both the Agency and the CASA agreed and requested that the juvenile court do so as soon as mother obtained independent housing and the Agency secured appropriate medical personnel to administer care during the visits. The Agency was looking into options to keep the minor safe, such as using a dedicated room at its offices for visits involving the minor in order to minimize exposure, and the social worker was working on securing an appropriate medical provider to be present during visits and teach mother how to care for the minor. The court authorized mother to begin in-person visits once she obtained noncommunal housing and the Agency secured appropriate medical staff.

Mother argues the denial of in-person visitation was arbitrary given that the minor was being seen by numerous providers and her foster caregivers. She surmises that there could be no reason to prohibit one more person–mother–from having contact with the minor, particularly if mother was fully vaccinated and COVID tested prior to each visit, wore full protective gear, and quarantined. Mother further argues that the Agency failed to hire nursing staff to be present during in-person visits and its claim that it did not have nursing support available amounted to a failure to provide reasonable services. We are unpersuaded by either argument.

The record makes plain that the minor required care by someone with specific knowledge and experience to monitor and address the minor's oxygen levels, G-tube feedings, suctioning, and any and all emergent medical issues arising as a result of the minor's medically fragile condition. Mother does not point to any evidence, and there is nothing in the record to suggest, that the Agency was not making reasonable efforts to

22

identify individuals who were both qualified and available to undertake the task on a regular basis, particularly during the worldwide COVID-19 pandemic.

We note that, in response to the ongoing pandemic, the Judicial Council promulgated Emergency Rule 6(c)(7)[2] which provided for child welfare agencies "to determine the manner of visitation to ensure that the needs of the family are met" and required that "[a]ll changes in manner of visitation . . . must be made on a case by case basis, balance the public health directives and best interest of the child, and take into consideration whether in-person visitation may continue to be held safely."

Acknowledging the importance of family time for the well-being of the parents and the child, particularly during times of crisis, Rule 6(c)(7) provides that "[v]isitation may only be suspended if a detriment finding is made in a particular case based on the facts unique to that case." Rule 6(c)(7) further provides that such detriment finding cannot be based solely on "the existence of the impact of the state of emergency related to the COVID-19 pandemic or related public health directives."

Here, several of the minor's physicians made clear that limiting the amount of contact between the minor and others was imperative and that any contact placed the minor at risk. Contrary to mother's assertion that the risk to the minor was nothing more than theoretical, the minor was not only in danger of exposure to viruses (including COVID-19), illnesses, smoke, and other airborne threats but also perils associated with the minor's numerous and unique health issues and the potential inability of those around her to respond to her emergent medical needs.

Even assuming, as mother argues, that in-person visits could have been facilitated with appropriate COVID protections, perfection in services is not required. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969; *In re Misako R.* (1991) 2 Cal.App.4th

---

[2] Further rule references are to the Judicial Council Emergency Rule.

23

538, 547.) We find no abuse of discretion in the juvenile court weighing mother's desire for in-person visits against the dangers associated with potential exposure to people and environments, including the risks associated with the COVID-19 pandemic and the minor's unique medical needs. (See *In re R.R.* (2010) 187 Cal.App.4th 1264, 1284 [court's visitation order balancing the rights of the parent with well-being of minor is reviewed for an abuse of discretion].)

Mother argues the juvenile court improperly delegated the decision regarding whether in-person visits should occur to the minor's pediatrician. Not so. As a preliminary matter, mother's argument is in reality a challenge to the court's visitation order, not the Agency's provision of services, and is therefore forfeited as discussed at the outset of this opinion. In any event, it is abundantly clear from the record that the juvenile court carefully considered the issue of in-person contact between mother and the minor each time the issue was raised. For example, when mother's counsel noted mother was fully vaccinated and was willing to COVID test and isolate in a hotel before each visit, the court stated, "I'm still of the opinion that we need to follow what the doctor is saying. I absolutely cannot risk this child's life and so one more month we'll put it off. . . . [¶] But with the breathing issues and everything else, it's just too risky." In each instance, the court denied in-person visits only after considering information from the Agency and recommendations from medical professionals that in-person visits could be harmful if not fatal to the minor and contrary to the minor's well-being.

Finally, mother repeatedly claims the lack of in-person visitation denied her the opportunity to have a relationship or reunify with the minor. Mother was not denied visitation. From the start of the proceedings, she attended videoconference visits with the minor regularly. She was also permitted to attend all of the minor's medical appointments virtually and was then eventually permitted to attend appointments in person, where she was permitted to hold and comfort the minor.

24

There is substantial evidence to support the juvenile court's finding of reasonable services with regard to visitation.

## B.  Training

Mother asserts the Agency unreasonably delayed in providing her the training necessary to care for the minor.  She argues the Agency's inability to provide someone with sufficient medical experience and training to provide support during in-person visits was unreasonable and the Agency failed to consider viable options such as having the foster care parents or respite care providers available during visits.  We are not persuaded.

From the start, Dr. Breneisen was adamant that in-person visits would need to be handled by someone such as a licensed nurse who was capable of monitoring and managing the minor's oxygen levels, completing G-tube feedings, and suctioning.  The minor also required monthly medications and a special diet and would have numerous appointments with doctors and specialists throughout her life.  Dr. Breneisen felt the parents would need to receive extensive training and feel comfortable completing those tasks.

Before the juvenile court authorized mother to visit or attend the minor's appointments in person, the Agency explored resources to provide mother with hands-on training on how to administer the necessary medical procedures in order to prepare her in the event the minor became medically stable enough for in-person visits.  Mother actively participated by video in all of the minor's medical and developmental appointments, where she observed experienced caregivers giving intervening life-saving actions such as increasing the minor's oxygen, suctioning her mouth, administering albuterol, and rescue breathing but at times did not seem to understand what was needed to assist the minor.  However, during video visits, mother experienced some processing delays, struggled to consolidate, and articulate the information provided by the minor's physicians and specialists, asked unrelated questions during appointments, and had to be reminded about

25

the focus of the appointment, and gave the orthotist inaccurate information about the minor's diagnoses.

Caregivers and other professionals expressed concern that mother's interactions reflected her lack of understanding of the minor's medical conditions and how to treat those conditions. In order to address those issues and determine how best to provide services to help, mother underwent a court-ordered psychological evaluation which revealed she had borderline intellectual functioning and difficulty understanding and executing increasingly complex tasks, and she demonstrated impaired memory and became easily overwhelmed. The evaluator concluded that mother was likely to have difficulty with "unexpected, unpracticed crisis situations and complex decision making" and would require specific education and support on how to respond to emergent crisis situations. By July 2021, the juvenile court authorized, and the Agency arranged for mother to attend medical appointments in person. She also received G-tube training during which she was given the opportunity to practice and ask questions. Because mother struggled to read the minor's cues during videoconference visits, the Agency also provided her with additional training.

Given the medically-fragile minor's unique medical needs, and the ongoing risks associated with the pandemic, the training services provided were reasonable under the circumstances. (*In re M.F.* (2019) 32 Cal.App.5th 1, 14; *In re T.G., supra*, 188 Cal.App.4th at p. 697.) The juvenile court's finding of reasonable services with respect to training is supported by substantial evidence.

C. *Housing*

Finally, mother claims the Agency failed to timely or diligently assist her in finding noncommunal housing. We disagree.

Mother was referred to a confidential shelter, a communal living environment for survivors of domestic violence, in early January 2021. Mother continued to reside at the shelter as of May 2021 but had been referred to two housing programs (one of which was

26

assigned to an intensive case manager), completed an application for a housing voucher, and was on the waiting list for housing. She was actively searching for an apartment and had submitted several applications for housing, and she ultimately received a Section 8 housing voucher at the end of the month. As mother's counsel informed the juvenile court on May 24, 2021, mother was working with her care providers to secure housing.

Mother claims the Agency and the juvenile court improperly denied her in-person visitation based on her communal housing, arguing the decision was premised on impermissible prejudice and speculation that survivors of domestic violence are more likely to engage in risky behavior, placing them at risk of COVID-19 exposure, that there was a voluminous number of other residents in the shelter, and that those other residents came and went from the shelter. We reject mother's first assertion outright as there is not a hint in the record that the housing concerns of either the Agency or the court had anything to do with a presumption of risky behavior by domestic violence survivors. We note that the later two assertions, assuming they are true, do not represent prejudice or speculation; rather, they represent a reasonable concern that mother was not the only person living in the shelter and that the comings and goings of the other residents raised the risk of exposure by mother and thus to the minor if in-person visits were authorized.

As set forth more than once in this opinion, the Agency's provision of services, training, housing assistance, and visitation was to a great extent limited by the juvenile court's orders and the ongoing pandemic. In the matter of housing assistance, the Agency provided mother with referrals, assisted her in filling out and obtaining housing vouchers, and collaborated with other service providers to help find and secure suitable housing. We have no trouble concluding those efforts were reasonable under the circumstances.

There was substantial evidence to support the juvenile court's finding of reasonable services.

## DISPOSITION

The juvenile court's order is affirmed.

_____\s\_____,
BLEASE, Acting P. J.

We concur:

_____\s\_____,
HULL, J.

_____\s\_____,
HOCH, J.